## NASHVILLE SYRUP CO. v. COCA COLA CO.

## COCA COLA CO. v. NASHVILLE SYRUP CO.

(Circuit Court of Appeals, Sixth Circuit. June 13, 1914.)

Nos. 2439, 2440.

**1. TRADE-MARKS AND TRADE-NAMES (§ 45\*)—DESCRIPTIVE WORDS—EFFECT OF REGISTRATION.**

The federal trade-mark statute does not directly operate to grant a monopoly to one who rightfully registers a descriptive or geographical word under the 10-year clause of Act Feb. 20, 1905, c. 592 (U. S. Comp. St. Supp. 1911, p. 1461) § 5, but removes from words which had been exclusively used as a mark in interstate commerce for 10 years the bar or disability caused by their descriptive or geographical character, and makes them, after their registration, subject to exclusive appropriation with the same effect, in the main, as if the disability had never existed.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 53, 59; Dec. Dig. § 45.\*]

**2. TRADE-MARKS AND TRADE-NAMES (§ 59\*)—INFRINGEMENT—"COCA COLA."**

The name Coca Cola, duly registered as a trade-mark for a syrup used as a basis for carbonated drinks, and which had by more than 10 years exclusive use prior to 1905 become the distinctive name under which complainants' product was known, *held* infringed by the name "Fletcher's Coca Cola" used on a similar product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 68–72; Dec. Dig. § 59.\*]

**3. TRADE-MARKS AND TRADE-NAMES (§ 22\*)—VALIDITY—DECEPTIVE NAMES.**

Whether a claimed trade-mark is so descriptive of something else as to be deceptive must be decided as of the time of its adoption.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 25; Dec. Dig. § 22.\*]

**4. TRADE-MARKS AND TRADE-NAMES (§ 22\*)—VALIDITY—DECEPTIVE NAMES.**

The name "Coca Cola" as applied to a flavoring syrup for carbonated drinks, containing about 2 per cent. of a compound made from coca leaves and cola nuts, *held* not so substantially and really deceptive as to invalidate it as a trade-mark under the 10-year clause of the act of 1905.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 25; Dec. Dig. § 22.\*]

**5. TRADE-MARKS AND TRADE-NAMES (§ 59\*)—INFRINGEMENT.**

Where a name has been exclusively used to designate the product of a particular manufacturer for so long a time as to have become identified with it in the minds of purchasers and to be a valid trade-mark it cannot be used by another on a similar product merely because ingredients

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

are used in such other product which make the name in a sense descriptive of it.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 68-72; Dec. Dig. § 59.*]

6. TRADE-MARKS AND TRADE-NAMES (§ 98*) — SUIT FOR INFRINGEMENT — ACCOUNTING FOR PROFITS.

On an accounting for profits for infringement of a trade-mark by a bona fide corporation, defendant is entitled to credit for the salary paid its manager, who was a minority stockholder only, as a part of its operating expenses.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 112; Dec. Dig. § 98.*]

7. APPEAL AND ERROR (§ 339*)—TIME FOR APPEAL—SUIT FOR INFRINGEMENT OF TRADE-MARK.

Where an interlocutory decree in favor of complainant was entered in a suit for infringement of a trade-mark, directing a reference for an accounting, a subsequent decree entered on the report of the master, whether or not it refers to the interlocutory decree in terms, has the effect of re-affirming it and rendering it final, and an appeal may be taken by the defendant at any time within the statutory time after entry of such final decree on which the decision embodied in the interlocutory decree may be reviewed. The fact that the appeal purports to be from the interlocutory decree, and that steps were taken therefor before such decree became final, which were perfected afterwards, is not a fatal irregularity.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1883-1887; Dec. Dig. § 339.*]

Appeals from the District Court of the United States for the Middle District of Tennessee; Edward T. Sanford, Judge.

Suit in equity by the Coca Cola Company against the Nashville Syrup Company. From the decree both parties appeal. Affirmed.

For opinion below, see 200 Fed. 157.

Coca is a South American shrub, from the leaves of which cocaine, among other substances, is obtained; the cola tree grows in Africa, and from its nuts caffeine may be extracted. The use of these leaves and these nuts by the natives in their respective countries, and for the supposed stimulating qualities, had long been known in this country, and before 1887 extracts respectively from coca leaves and from cola nuts had found a place in the pharmacopœia. There was little popular knowledge concerning them. The extracts were used only by druggists in compounding medicine. In 1887 Pemberton, an Atlanta druggist, registered in the Patent Office a label for what he called "Coca Cola Syrup and Extract." The plaintiff below, the Coca Cola Company, was organized as a corporation in 1892, and acquired Pemberton's formula and label. Since that time, it has continuously manufactured and sold a syrup under the name, "Coca Cola"; and, used as a basis for carbonated drinks, the syrup, under this name, has had a large sale in all parts of the country. In 1893 the Coca Cola Company (herein called plaintiff) registered the name "Coca Cola" as a trade-mark, and again in October of 1905, and pursuant to the act of February 20, 1905, the name was registered by plaintiff as a trade-mark under the 10-year proviso of that act. Plaintiff enjoyed the exclusive use of the name from 1892 until 1910. In that year, J. D. Fletcher, now the active manager of the Nashville Syrup Company (herein called defendant), became interested with others in the manufacture of a somewhat similar syrup being sold under the name "Murfe's Cola." Later in that year they changed the name of their product to "Murfe's Coca Kola," and shortly afterwards, Mr. Fletcher became sole owner of the business, and the product was named "Fletcher's Coca Cola," and has been sold by him and his successor, the Nashville Syrup Company, under that name. The bill of complaint herein claimed

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for plaintiff a common-law trade-mark in the name, and also claimed trademark rights by virtue of the registration under the act of 1905. It also alleged that the words of the name, if they ever indicated anything other than plaintiff's product, had acquired a secondary meaning limited to that article, and that defendant was engaged in unfair competition. Jurisdiction sufficiently depended on diverse citizenship.

On the usual so-called final hearing, the District Judge concluded that plaintiff had a valid statutory trade-mark under the act of 1905, and that it had been infringed, and accordingly ordered an injunction and a reference to ascertain the damages (200 Fed. 153, 157). The master reported his finding of damages, but defendant's exception was sustained and a decree was entered finding no damages. The defendant appealed from the decree for injunction, and plaintiff appealed because it failed to recover damages.

J. B. Sizer, of Chattanooga, Tenn., and Harold Hirsch, of Atlanta, Ga., for plaintiff.

Perkins Baxter, of Nashville, Tenn., and E. W. Bradford, of Washington, D. C., for defendant.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. Passing, for the present, without deciding, the question whether the name Coca Cola was, in 1887 or in 1892, so far descriptive of the article as to be incapable of appropriation as a common-law trade-mark, and passing, also without deciding, the question whether the name, if primarily descriptive, had, before suit was brought in 1910, acquired a secondary meaning, we come to the effect of the registration under the act of 1905. The broad questions on which defendant relied concerning the effect of this act have been set at rest against defendant's contention, by the decision of the Supreme Court in Davids Co. v. Davids, 233 U. S. 461, 34 Sup. Ct. 648, 58 L. Ed. 1046. In view of the settled rule that the federal trade-mark statute does not create any exclusive right, as the patent statute does, but only recognizes a right which has been already acquired by exclusive appropriation, and then furnishes evidence and remedies (Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550; Hopkins on Trade-Marks, § 27; Hesseltine's Law of Trade-Marks, p. 139), we do not regard the decision in the Davids Case as holding that the statute directly operates to grant a monopoly to one who rightfully registers under the ten-year clause a descriptive or geographical word. We take it as holding that the statute was not intended to permit, under this clause, an ineffective and useless registration, and so, in effect, holding that the statute removed from descriptive words which had been exclusively used as a mark in interstate commerce for 10 years the bar or disability caused by their descriptive character, and made them, after that probation, subject to exclusive appropriation with the same effect, in the main, as if the disability had never existed. Since the statute relates primarily to registration, it may well be that the disability continues until registration, somewhat retroactively, removes it; that is not now important. Neither is it important at present to know the exact distinctions between the manufacturer's rights formerly existing under the secondary meaning theory

215 F.—34

and those now existing under the statute. Since it appears that plaintiff had enjoyed the exclusive use of the name "Coca Cola" for more than 10 years before 1905, and that there was due registration under the act of 1905, it follows that plaintiff's exclusive rights as a trademark owner and as defined in the Davids Case, are established.

Whether any exclusive rights which, in an essential part, depend on this statute can extend to the regulation of strictly intrastate commerce, or whether the effect must be limited to the field where Congress had power to act, is an interesting question, which is only suggested, but not presented, by this record. It is not raised by assignment of error or by the briefs. We, therefore, give it no consideration.

[2] 2. We think the infringement sufficiently appears. Here, also, the Davids Case is instructive. The specific form in which the mark was registered in that case was not considered important; and so it cannot be here controlling, whether the words "Coca Cola" are with or without a hyphen, or are in script or in plain letters. Neither is infringement avoided because defendant marks its bottles "Fletcher's Coca Cola." Not only does this qualification in the name fail effectively to reach the ultimate consumer (Coca-Cola Co. v. Gay-Ola Co., 200 Fed. 720, 119 C. C. A. 164, and 211 Fed. 942, 128 C. C. A. 440), but a trade-mark right which could be so avoided would be of no value. Indeed, even under the secondary meaning theory, and without the aid of the statute, such marking would not sufficiently differentiate. Merriam v. Oglivie, 170 Fed. 167, 95 C. C. A. 423, and cases cited on page 168; Davids Co. v. Davids, supra. A case may arise where the words registered under the statute are so wholly and so merely descriptive and so unfit to carry an arbitrary meaning indicating registrant's product only that the use of the words coupled with defendant's name as manufacturer would not infringe; but this is not that case. The words here involved were, if fairly "descriptive" at all, not purely descriptive, and by 10 years' exclusive use they had become the distinctive appellation of plaintiff's product. To permit defendant to use them in connection with his own name is not to avoid or mitigate the wrong, but is rather an aggravation, because of the false implication that plaintiff has parted with the exclusive right. Jacobs v. Beecham, 221 U. S. 263, 272, 31 Sup. Ct. 555, 55 L. Ed. 729.

3. There remains the question whether the mark is deceptive. Defendant does not expressly make this point, but it is so bound up with the questions of how merely descriptive the words are, and whether the same words as used by defendant are only the rightful name of its product, that it must be decided. The act of 1905 makes no exception in this respect, but we assume that if the registered words clearly carried deception, and if their use really represented to the purchasers that the article was something essentially different from the thing which they actually received, the courts would not enforce any exclusive rights under such registration, both because plaintiff would come into court with unclean hands (California Co. v. Stearns, 73 Fed. 812, 816, 20 C. C. A. 22, 33 L. R. A. 56), and because such words could not be within the fair contemplation of the act, when it refers to "any mark * * * which was in actual and exclusive use as a trade-mark,"

etc. The inquiry whether the mark is deceptive and misleading is not dissimilar to the question whether the same words constitute the distinctive name of another article, which question we have considered in our opinion in United States v. Coca Cola Co., 215 Fed. 535, this day filed; but there may be some such special force in the words "distinctive name" found in the Pure Food Law that a mark might be thought deceptive or misleading even though it was not the "distinctive name of another article." Hence, the point requires, in this case, further consideration.

The argument is that the use of the name, "Coca Cola," implies to the public that the syrup is composed mainly or in essential part of the coca leaves and the cola nut; and that this is not true. The fact is that one of the elements in the composition of the syrup is itself a compound made from coca leaves and cola nuts. This element becomes a flavor for the complete syrup, and is said to impart to it aroma and taste characteristic of both. This flavoring element is not in large quantity (less than 2 per cent.), but it is impossible to say that it does not have appreciable effect upon the compound. The question then is whether the use of the words is a representation to the public that the syrup contains any more of coca or of cola than it really does contain.

[3] We think it clear that whether the claimed trade-mark is so descriptive of something else as to be deceptive must be decided as of the time of adoption. It cannot be that rights once lawfully acquired by exclusive appropriation can be defeated by subsequent progress of public knowledge regarding some other substance of similar name. It is undisputed that during the period shortly after 1892, while this name was coming into public knowledge in connection with plaintiff's product, little or nothing was popularly known about either coca leaves or cola nuts, although existing technical or cyclopedic publications gave information. It is not important whether Pemberton's original form, "Coca Cola Syrup and Extract," was so descriptive as to be deceptive if applied to a compound not composed mainly of these ingredients. The name in which trade-mark rights have been acquired is the compound name "Coca Cola," and this name may not, for all purposes, be the same as if it was "Extract of Coca and of Cola."[1] Neither of these words alone had any absolute complete meaning, but when the words were put together to make the compound term, the ambiguity of meaning was intensified. If coca was spoken of, the reference might be to the leaves, or to a decoction or to an extract; "cola" might refer to the nuts or to a powder or to a paste or a fluid; and so, when the public first saw the name "Coca Cola," it could not know, as we said in the accompanying case, whether the substance was medicine, food, or drink, or whether it was intended to swallow, smoke, or chew. One who had all the existing available information could only infer that the new substance, whatever it was, had some connection with these two foreign things. The case would be somewhat different if each of the two named elements was itself definite and certain, but neither is. To illustrate by more common substances: Sage

---

[1] But see Coca Cola Co. v. American Co. (D. C.) 200 Fed. 107, where Judge Lacombe thinks this form to be an infringement.

is a shrub, used in various ways; the almond is a nut, eaten raw or prepared in numerous methods. The compound name "Sage-Almond," as a label, would convey a very indefinite idea, if any, as to what would be found when the package was opened; and, if we assume that "Sage-Almond" turned out to be a drink in connection with which sage leaves and almonds had been used, we have, in this illustration, a close analogy to Coca Cola; yet this name, applied to a soda fountain beverage, would not deceive the public into supposing that it contained all the virtues of sage tea and all of the nourishment of the almond nut meats. Such an article could honestly enough carry the supposed name "Sage-Almond"; and after 20 years exclusive use of the name it would not still be common property. A newcomer might rightfully sell (e. g.) "Sage Tea with Almond Flavor"; he might not take the peculiar, precise, and really arbitrary compound name.

Plaintiff's counsel say, and so far as we see accurately say:

"The use of a compound name does not necessarily * * * indicate that the article to which the name is applied contains the substances whose names make up the compound. Thus, soda water contains no soda; the butternut contains no butter; cream of tartar contains no cream; nor milk of lime any milk. Grape fruit is not the fruit of the grape; nor is bread fruit the fruit of bread; the pineapple is foreign to both the pine and the apple; and the manufactured food known as Grape Nuts contains neither grapes nor nuts."

Many names which, as to the, claim that they are so descriptive as to be deceptive in the manner in which they are used, must be classified with Coca Cola, have been sustained as proper trade-marks. The Court of Appeals of New York thought that "Sliced Animals" was not merely descriptive, and was capable of exclusive appropriation. Selchow v. Baker, 93 N. Y. 59, 45 Am. Rep. 169. The same court considered "Bromo Caffeine." Defendant in that case insisted that he could call his product "Bromo Caffeine" because it was, and because plaintiff could not adopt, as a trade-mark, the words so indicating the composition of the article. It was decided that while the name indicated a compound of caffeine with some bromide, this indication was too vague and indefinite to put the name beyond the forbidden limit. The discussion by Judge Peckham is thoroughly applicable to the instant controversy. Keasbey v. Bromo, etc., Wks., 142 N. Y. 467, 474, 476, 37 N. E. 476, 40 Am. St. Rep. 623. A very similar case is that concerning "Lacto Bacilline." Application of La Societe Ferment, 81 L. J. R. 724.[2] In Ludington v. Leonard, 127 Fed. 155, 62 C. C. A. 269, it was specially urged upon the Circuit Court of Appeals of the Second Circuit that the name "carroms" as applied to a game resembling billiards was either too accurately descriptive or too deceptive and misleading to be exclusively used even under the secondary meaning theory; but the contention was not upheld. Perhaps the controlling distinction cannot be better expressed than was done by Judge Sho-

---

[2] This case is more fully reported in the Official Journal of the Patent Office, "Reports of Patent and Trade-Mark Cases, Vol. 29," before Justice Joyce, at p. 149, and on appeal, at p. 497, Justice Joyce was reversed. These reports are in the old English method, and the discussions between court and counsel cover every phase of the question.

walter when he said (American Fiber Chamois Co. v. De Lee [C. C.] 67 Fed. 329, 331):

"If said words, as here combined, have any sense, as descriptive of the class of goods in question, it is not so pronounced, obvious, and usual as to make said combined words unfit, inappropriate or misleading, as a name, sign, or mark of origin of complainant's goods."

Cases like Standard Co. v. Trinidad Co., 220 U. S. 446, 31 Sup. Ct. 456, 55 L. Ed. 536, are sharply distinguishable. In that case, it was found as a fact that the word involved, "Rubberoid," was in common dictionary use as an adjective, so that it was merely descriptive. There was no room for it to carry any arbitrary character in addition. This feature, with its attendant distinction, is typical of the cases relied upon by appellant. When it cannot be said that the words "Coca Cola," from 1895 to 1905, gave to the public "reasonably accurate, and tolerably distinct knowledge as to what the ingredients"[3] were, these cases relied on by appellant lose their pertinence.

[4] We conclude that the name Coca Cola as applied to plaintiff's product, while undoubtedly suggestive, is not so substantially and really deceptive as to invalidate the registered mark.

[5] 4. Closely connected with what has been said, but separately urged by defendant, is the claim that because in compounding its product defendant has used coca leaves in considerable quantity and has used real cola nuts to furnish the caffeine, it must be permitted to call its article "Coca Cola." This is really another aspect of the matter already decided. If the name is not so substantially and definitely descriptive (rather than suggestive) as to be deceitful if employed where the supposed description is not true, it follows that the name is not so merely descriptive that its use remains of common right after public acquiescence for 20 years in plaintiff's exclusive appropriation. Analogy is found in the illustration above quoted from counsel. Assuming that "Grape Nuts" had been exclusively used for a long period as the distinct name of a particular maker's compound food, could a newcomer rightfully take away a part of the established trade by using the same name for his new compound, just because it contained some nuts and was flavored with grape juice? To us, a negative answer seems imperative, and no less so in the instant case.

[6] 5. On the accounting before the master, plaintiff did not seek damages as such, but asked an award of the profits made by defendant. No question arises except that presented by the fact that Mr. Fletcher, the general manager of defendant corporation, received during the infringing period a salary of $2,700. If defendant was entitled to credit for this salary as a part of its operating expenses, there were no profits; if the item was an improper credit, there was a balance of profit to be recovered. Without question, the defendant was an actual corporation organized in the regular way for business purposes. It succeeded to Mr. Fletcher's private business. He actively caused it to be organized, and he became and continued president and general manager. Two-thirds of the capital was contributed by others, and Mr. Fletcher

[3] Judge Peckham's language in Keasby v. Bromo, etc., Wks.

did not have the control of the corporation, except by sufferance of the majority of the stockholders. There is no claim that the corporation was a mere sham or subterfuge brought into existence to cover up his individual activities. Under these circumstances, and when the only question is the amount of profits which the corporation actually made, justice to the majority stockholders, if no other reason, requires that his fair and reasonable salary be treated like any other disbursement. The District Judge was right in concluding that there was no profit.

[7] 6. The plaintiff moved to dismiss defendant's appeal from the interlocutory decree for injunction, because the appeal was not taken within 60 days; and, as this motion raises a question of our jurisdiction, it must be considered. The interlocutory decree awarding injunction and making a reference to take an account of damages was entered July 29, 1912. The master's report was filed October 8th; defendant excepted, and the final order of the court on the exceptions was dated November 25th. This order made no reference in terms to the order of July 29th, and was, in terms, confined to the sustaining of one exception, the overruling of another, an adjudication that the plaintiff had failed to establish any damages, and a disposition of the costs. November 11th, the defendant had claimed and had been allowed "an appeal from the decree of July 29th," and had assigned errors thereon, but the citation was not issued nor the bond on appeal approved until November 26th. Clearly the decree of July 29th did not become final until the order of November 25th. This last order might well have repeated, in terms or by reference, the provisions of the order of July 29th, so that there would have been one complete, final decree; and we think this would have been according to the most careful practice; but the order of November 25th necessarily has this effect, and operates to redeclare the adjudications which, up to that time, had been interlocutory and within the control of the court, and which then, for the first time, became final. The defendant then had six months within which to appeal from any part of this consolidated final decree. Loveland's Appellate Jurisdiction, 467, 468; Grant Co. v. Laird Co., 212 U. S. 445, 29 Sup. Ct. 332, 53 L. Ed. 591. Inasmuch as the appeal which defendant did take was not perfected until after this final decree had been entered, we think it may properly be treated as having been taken from that decree. No prejudicial irregularity comes from the fact that July 29th was named as the date of the decree from which appeal was taken and to which error was assigned. It would have been absolutely accurate to appeal "from the decree of July 29th as re-entered on November 25th," and this is the substantial effect of what was done. The same result is reached by considering that the time for appeal from the decree of July 29th (under section 11 of the Circuit Court of Appeals Act [Act March 3, 1891, c. 517, 26 Stat. 829; U. S. Comp. St. 1901, p. 552], as distinguished from one under section 129 of the Judicial Code [Act March 3, 1911, c. 231, 36 Stat. 1134; U. S. Comp. St. Supp. 1911, p. 194]) did not begin to run until November 25th. That the appeal was prayed and allowed prematurely and before the effective entry of the decree appealed from is not a fatal irregularity. For this purpose, these preliminary steps may

be treated as speaking as of the day when they became fully effective by the perfecting of the appeal. The motion to dismiss must therefore be denied.

Upon both appeals, the judgment below is affirmed.